**JAMES SKYLAR COOPER**
**September 16, 2020**

1

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

CHARLESTON DIVISION

```
- - - - - - - - - - - - - - - - -X
In the Matter of                  :
                                  :
ERIE INSURANCE PROPERTY           :
& CASUALTY COMPANY,               :
                                  :
                   Petitioner,    :   CIVIL ACTION
    vs                            :   NO. 2:20-CV-00321
                                  :
JAMES SKYLAR COOPER,              :
                                  :
                   Respondent.    :
- - - - - - - - - - - - - - - - -x
```

Conference Room, Law Offices of
Farmer, Cline & Campbell, PLLC,
746 Myrtle Road,
Charleston, West Virginia, 25314,
Wednesday, September 16, 2020

The Deposition of JAMES SKYLAR COOPER, taken by the Petitioner, before Elizabeth Wiley, a Stenotype Reporter and Notary Public within and for the State of West Virginia at Large, pursuant to notice, to be used for all purposes, pursuant to the West Virginia Rules of Civil Procedure, commencing at 09:59 a.m., EDST.

COPY

VOLUME:  I                                PAGES:  1 - 39

Daisey Reporting Services - 304-425-5922

EXHIBIT
1

JAMES SKYLAR COOPER
September 16, 2020

**Page 2**

APPEARANCES

MATTHEW J. PERRY, ESQ.,
   Lamp, Bartram, Levy, Trautwein & Perry, PLLC,
     720 Fourth Avenue,
     PO Box 2488,
     Huntington, West Virginia, 25725-2488,
     appearing on behalf of
     the Petitioner.

R. CHAD DUFFIELD, ESQ.,
   Farmer, Cline & Campbell, PLLC,
     746 Myrtle Road,
     Charleston, West Virginia, 25314,
     appearing on behalf of
     the Respondent.

**Page 3**

PROCEEDINGS
MR. PERRY: Would you please swear the witness?
Whereupon,
     JAMES SKYLAR COOPER,
was called as a witness and, after having been first duly sworn by the Notary Public, testified as follows:
     EXAMINATION
BY MR. PERRY:
Q. Can you state your full name for me, please?
A. James Skylar Cooper.
Q. And do you go by Skylar?
A. Yeah.
Q. Is it okay if I call you Skylar today?
A. Yeah.
Q. Okay. I assume you've never been through a deposition before?
A. No.
Q. Your attorney has probably given you some indication of what today's about and how it's going to proceed, but just a few things. I don't expect that we'll be here long, but if you need a break for any reason, just let me know.
A. Okay.

**Page 4**

Q. So as I ask you questions today, the thing that's kind of most important is that the record is clear. So whenever you're done, she's going to prepare a transcript that we can go back and read, so your responses and how we communicate today will be important to make sure that the transcript is as clear as can be.
A. Okay.
Q. So, for example, if I ask a question that calls for a "Yes" or "No" answer, try to say "Yes" or "No" rather than "Uh-huh" or "Huh-uh." If I ask you a question, and the answer is "Yes" or "No," you're free to elaborate if you want, or not.
A. Okay.
Q. Just try to give me a "Yes" or "No" rather than "Uh-huh's" or shakes of the head, because those won't transcribe onto the record.
A. Okay.
Q. You may anticipate a question that I'm going to ask and want to go ahead and give me your answer, but the best that you can, try to let me finish before you start to speak, and then I'll do the same; that way, we're not talking over top of each other.
And then, probably especially important today, there may be questions you don't hear, or you don't

**Page 5**

understand, especially with the masks.
A. Right.
Q. So if you don't understand the question, just let me know, and I'll repeat it, rephrase it, whatever.
A. Okay.
Q. All right. What is your current residential address?
A. 
Q. And do you live there with anybody?
A. My girlfriend stays there with me.
Q. Okay. What's her name?
A. Savannah Brown.
Q. Is this the location that you were living at at the time of the accident?
A. I was back and forth from my grandma's house and my mom's house. That's actually my mom's house there. It's just me and my girlfriend living at it now, though.
Q. Okay. On the day of the accident, do you remember where you were staying?
A. Yeah. I was at my maw-maw's that morning.
Q. Okay. And do you know the address there?
A. Yep.

JAMES SKYLAR COOPER
September 16, 2020

**Page 6**

2   Q. Okay. So, at the time of the accident, I
3   understand that you were employed by Pison Management?
4   A. Yeah.
5   Q. Tell me, what does Pison Management do?
6   A. I know they do construction. I'm pretty sure
7   they build apartment complexes. But what I was doing, I
8   was doing lawn care and, like, maintenance work for the
9   apartments.
10  Q. Okay. Are you still employed?
11  A. I'm getting checks through Workers' Comp
12  currently, so...
13  Q. Okay. So you're off work right now due to your
14  injuries?
15  A. Right.
16  Q. As far as your employment with Pison
17  Management, that's still there for you to return once
18  you're released to return?
19  A. I'm not sure. I'm not a hundred percent sure,
20  because I haven't heard from anybody since the accident
21  happened, so, yeah.
22      MR. DUFFIELD: Skylar, you're doing fine.
23  Just make sure you let him finish his question before
24  you give your answer.

**Page 7**

1       THE WITNESS: Oh, I'm sorry. Sorry about
2   that.
3       MR. PERRY: Oh, you're good. I'll do the
4   same thing. It happens.
5   BY MR. PERRY:
6   Q. How did you get to and from work in and around
7   the time of the accident? Did you own a car?
8   A. Yeah. But, at the time of the accident, I was
9   riding in Rick Huffman's car, which was my co-worker.
10  Q. So you would drive your car to work, and then,
11  at least when the accident occurred, you were in Mr.
12  Huffman's vehicle?
13  A. We would kind of switch off. Sometimes he
14  would drive; sometimes I would drive.
15  Q. Meaning he would pick you up at your house?
16  A. Yeah. We had a spot that we would meet, and
17  I'd park my car there, and he would park his, and we'd
18  ride together.
19  Q. Okay. So there would be occasions you would
20  meet Rick Huffman, he would park his car, and the two of
21  you would ride in your car to work?
22  A. Right.
23  Q. And vice versa?
24  A. Yes.

**Page 8**

1   Q. Okay. And did you have a designated location
2   that you would go to every morning for work?
3   A. Yes.
4   Q. What location is that?
5   A. It was the bottom of my grandma's hill,
6   actually. I think it's called
7   Q. And is this where you would meet Mr. Huffman
8   and park, or is this where you went to actually report
9   to work?
10  A. That's where I would meet him and park, and
11  then we'd ride together.
12  Q. Okay. And do you know the location of where
13  you would go to travel to work?
14  A. What do you mean? I'm sorry.
15  Q. So after the two of you, you and Mr. Huffman,
16  met, and one of you drove, where did you drive to?
17  A. We had different locations, different apartment
18  complexes we'd go to. There was one in Hurricane.
19  There was one in Cross Lanes. There was one off of
20  MacCorkle Avenue. I think there was another one, but
21  I'm not sure. So it just depended on the day which one
22  we'd go to.
23  Q. Okay. So when you all would travel to work,
24  you would just travel directly to whatever site you were

**Page 9**

1   going to do lawn care for that day?
2   A. Well, most of the time, we'd go to the place in
3   Cross Lanes, because it had the equipment for the lawn
4   care stored there, yeah.
5   Q. Okay. Do you know the address at Cross Lanes?
6   A. I do not.
7   Q. So were there times where you would not go to
8   Cross Lanes first and then just go directly to a site,
9   or did you always go to Cross Lanes?
10  A. I'd say 80 to 90 percent of the time we would
11  go to Cross Lanes first. Only a handful of times we
12  would go straight to the job site.
13  Q. Okay. At the time of the accident, who was
14  your supervisor?
15  A. Well, we had Demetrius would be -- there was
16  three of us, me, Rick and Demetrius, and he was kind of
17  head of our crew. And then there was John. I can't
18  think of his last name, but John was like the main boss,
19  kind of.
20  Q. Okay. Are you aware of any policy that Pison
21  Management had as far as using personal vehicles to
22  travel to and from job sites?
23  A. Personal vehicles?
24  Q. Yeah. So any policy that you're aware of that

10

1  Pison Management said, you know, you should use Pison
2  Management vehicles to travel to and from the sites that
3  you were going to do lawn care?
4      A.  No.  They never told us to use their own
5  vehicles to travel.
6      Q.  Is there a particular time that you always
7  report to work every day?
8      A.  Yeah.  It was 8:00 a.m., besides the morning of
9  the accident, actually.
10     Q.  How did that differ on the day of the accident?
11     A.  I think we were supposed to be in Cross Lanes
12 at 7:00 that morning, because we was going to a
13 different job site that me and Rick had never been to,
14 and it was like an hour-and-a-half away from Cross
15 Lanes, so we met that morning at around 7:00 a.m.
16     Q.  Aside from the job site you were going to, on
17 the day of the accident, how many different job sites
18 would you usually work at?
19     A.  Do you mean in a day?
20     Q.  No.  Over the course of your work there.  You
21 indicated that there were different apartment complexes.
22     A.  I would say, and I'm not a hundred percent
23 sure, but I think it's around five, five or six maybe.
24     Q.  Okay.  And are all of these apartment

11

1  complexes?
2      A.  Yeah, besides one.  I think it's in downtown
3  Charleston, I believe, and it's like more of like
4  a -- it looks like a house, but I'm not sure exactly
5  what it is, but I know it's an apartment complex.
6      Q.  Okay.  And your job, was it full-time?
7      A.  Yeah.
8      Q.  So 40 hours a week?
9      A.  Yes.
10     Q.  And during the course of the week, then, you
11 all would perform lawn care at these five or six
12 different sites, the apartments and then the one house
13 in Charleston?
14     A.  Yes.  Like, on different days, we'd be assigned
15 to different locations throughout the week.
16     Q.  And would you cover more than one location a
17 day?
18     A.  Sometimes we would, but most of the time it
19 seemed that we would just cut grass at the one location,
20 and then do the maintenance order for that same
21 location.
22     Q.  Okay.  And you mentioned maintenance orders.
23 Aside from lawn care, what type of maintenance orders
24 would you address?

12

1      A.  Anything that the people living in the
2  apartments would need, like change a light, fix a sink,
3  fix a commode, patch drywall.
4      Q.  Okay.  And were your shifts pretty routine as
5  far as the site you would go to on particular days?
6      A.  Yeah.  Like, Mondays would be a certain place,
7  and so on.
8      Q.  Okay.  And you indicated, earlier, that there
9  were occasions that you would not go to Cross Lanes but
10 would travel directly to the site you were working at.
11 Is that right?
12     A.  That was only on a few occasions.  Usually,
13 whenever we would go to the place in downtown
14 Charleston, Demetrius would just meet us there, because
15 it was more out of our way to drive all the way to Cross
16 Lanes and then back to the location.
17     Q.  Is that the only location you would typically
18 travel to directly before going to Cross Lanes?
19     A.  I'm not a hundred percent, but I belive so.  It
20 might have been the Chesterfield Apartments, too, the
21 one off MacCorkle, a few times.
22     Q.  And so was the reasoning behind not going to
23 Cross Lanes just simply that it was closer for you to
24 travel directly to the site?

13

1      A.  Yes.
2      Q.  And then how long had you been working at Pison
3  Management before the accident?
4      A.  I'd been on payroll for -- not long, probably a
5  month to two months.
6      Q.  And prior to being on payroll, as you phrase
7  it, was there any work that you were doing for Pison
8  Management?
9      A.  Yeah.  We was doing pressure washing for them
10 I'd say for two months, around.
11     Q.  And you are saying "we."  Who is "we"?
12     A.  Me and Rick Huffman.
13     Q.  Okay.  And so the time that you were doing
14 pressure washing, you were just getting lump sums?  It
15 wasn't like a payroll check?
16     A.  Right.  It was just non-taxed checks.
17     Q.  And how did that change, or why did that
18 change?  I mean, did you apply for a job?
19     A.  No.  I think we had just been pressure washing
20 for around two months, and then he just showed up, the
21 boss just showed up one day, and gave us forms to fill
22 out and said we'd be hired on payroll.
23     Q.  Okay.  And you said "the boss," is that John?
24     A.  No.  I believe he's like the owner of the

JAMES SKYLAR COOPER
September 16, 2020

**Page 14**

1 company, but I'm not sure what his name was.
2  Q. Okay. Did you have any type of training once
3 you became employed at Pison Management?
4  A. No, not really. We just kind of jumped right
5 into it.
6  Q. Prior to going on payroll, had you worked with
7 Demetrius Elder before?
8  A. No.
9  Q. Did you know Rick Huffman prior to, I guess,
10 you starting at Pison?
11  A. Yes.
12  Q. How did you know him?
13  A. We had worked together doing different
14 construction jobs. I met him through a friend.
15  Q. Okay. Did you consider him a friend?
16  A. Yes.
17  Q. As far as vehicles that were used, once you
18 went on the payroll, obviously there was a, I believe, a
19 Chevy Silverado truck that Pison Management had?
20  A. Yes.
21  Q. Okay. Were there any other vehicles that you
22 all used during the time that you worked there?
23  A. No. I know they owned a 2019 Dodge Ram I
24 believe, but we never -- me and Rick never used it.

**Page 15**

1  Q. Did Demetrius Elder ever use it?
2  A. I'm not a hundred percent sure, but I don't
3 think so.
4  Q. Was there more than one, what I would call, a
5 lawn care maintenance team?
6  A. We was the only one, just us three.
7  Q. Okay. And do you know what they were using the
8 2019 Dodge Ram for?
9  A. At first, John -- or they had bought it, and
10 John was just -- he worked on the AC units, and I think
11 he would drive it to different locations doing his job.
12 And then, after a while, two other guys that did inside
13 work, like painting and stuff like that, they would end
14 up using it.
15  Q. Who are these two other guys?
16  A. I'm not sure what their names were.
17  Q. Okay. So the truck that you all primarily used
18 it looks like was a 2004 blue Chevy Silverado?
19  A. Yes.
20  Q. Prior to the accident, when you would go to
21 Cross Lanes, before going to a job site, how often would
22 you ride in the Silverado versus your personal vehicle?
23  A. The first few weeks I believe it was almost
24 every time. And then it got to where it was so cramped,

**Page 16**

1 with three guys up front, and it was just a single-cab,
2 that we decided to start taking a personal vehicle.
3  Q. Okay. Did you talk to anybody at Pison
4 Management about being able just to use your personal
5 vehicle to go to and from sites, or did you just kind of
6 do it?
7  A. I'm not sure if we did talk to anybody, or not.
8  Q. Did you have any sense as to how long you had
9 been on payroll prior to the accident?
10  A. I'm not a hundred percent sure, but I would say
11 a month to three months maybe.
12  Q. Okay. So did Demetrius Elder always operate
13 the Silverado when you all worked?
14  A. Yes.
15  Q. So when you would drive your personal vehicle
16 to a job site, and you finished for the day, would you
17 report back to Cross Lanes or just go home?
18  A. I'd say 90 percent of the time we'd go back to
19 Cross Lanes and help unload the trailer and get it off
20 the truck.
21  Q. Okay. And so when you would unload the
22 trailer, would you also detach the trailer from the
23 truck?
24  A. I believe so.

**Page 17**

1  Q. Okay. Did Demetrius Elder have his personal
2 vehicle that he could drive, and you left the truck at
3 Cross Lanes, or did he drive it home?
4  A. What do you mean? I'm sorry.
5  Q. Once you got back to Cross Lanes, was the
6 Silverado left at the job site at Cross Lanes?
7  A. Yes.
8  Q. Meaning Demetrius Elder had his own
9 transportation?
10  A. Yes.
11  Q. Okay. Do you know why you would detach the
12 trailer after every shift?
13  A. I'm not sure.
14  Q. Did you store the trailer in a particular
15 location?
16  A. I don't remember exactly, but I believe it
17 would just be sat outside of the storage building, and
18 then we would put the equipment back inside the storage
19 building, I belive.
20  Q. Okay. And when we talk about this trailer, is
21 this kind of a flatbed trailer that has the ramps that
22 will fold up at the end?
23  A. Yes.
24  Q. Okay. So each morning that you would go to

18

1 Cross Lanes the first job that you would do then would
2 be to attach the trailer to the Silverado and then load
3 the truck and the trailer with equipment?
4 　A. Right.
5 　Q. Did you have, or own, any of the equipment that
6 was used, or was it all Pison Management's?
7 　A. It was all Pison.
8 　Q. Okay. What types of equipment did you load
9 into the trailer?
10 　A. I'm not a hundred percent sure what all I
11 loaded each day, but I know there's a Zero Turn, a push
12 mower, I believe three weed eaters, and I believe that's
13 about it.
14 　Q. Was there anything else that you would take
15 that was in the bed of the truck?
16 　A. I know Demetrius would put his tools back
17 there, and Rick would, as well. I'm not sure if there's
18 anything else, though.
19 　Q. What type of tools did Demetrius have? Do you
20 know?
21 　A. I'm not exactly sure what all he had. I know
22 he had like a little handheld tool box, and he'd have
23 like wrenches and screwdrivers, just basic tools.
24 　Q. Okay. And then Rick, you said he had tools, as

19

1 well?
2 　A. Yeah. About the same, just basic.
3 　Q. A tool box?
4 　A. Yeah.
5 　Q. Okay. You did not have any tools?
6 　A. No. Me and Rick would use the same ones,
7 basically.
8 　Q. And then if you had a maintenance order that
9 required you to do drywall, or something else where you
10 needed supplies, were those on-site, or how did you get
11 those?
12 　A. Demetrius always knew what the work orders
13 would be, if we needed to bring something with us. But
14 if not, I believe each location had a storage closet
15 that had like basic stuff if you needed it.
16 　Q. Okay. So let's talk about the day of the
17 accident. I've seen some medical records that indicate
18 that when you first went to the hospital, after the
19 accident, you had some memory loss, or didn't recall
20 much of the events. Has that changed since then?
21 　A. I remember more than I did at the time, for
22 sure.
23 　Q. Okay. How clear is your recollection of the
24 events leading up to the accident?

20

1 　A. Leading up to it, I remember most of the
2 morning, just more so, when it happened, after that is a
3 little spotty.
4 　Q. Okay. So I think I recall that you said that
5 you believe you reported to work at 7:00 that morning
6 because you were going to a different site?
7 　A. Right.
8 　Q. Where were you going to? Do you know?
9 　A. I just know it was approximately an
10 hour-and-a-half away. I'm not sure of the exact
11 location, because we had never been there before.
12 　Q. And do you know why you were going there that
13 day?
14 　A. Yeah. We was going to cut grass. I remember
15 they had said that it had been a while since it had been
16 cut.
17 　Q. Okay. The accident occurred when you were en
18 route to the job site?
19 　A. Correct.
20 　Q. Do you know if this job site was property that
21 was owned or managed by Pison Management?
22 　A. I'm not a hundred percent sure, but if I had to
23 guess, I would say "yes."
24 　Q. And do you know the approximate location, town,

21

1 where you were going to?
2 　A. No. I'd never heard of the place before.
3 　Q. So I'm assuming Rick Huffman was the one to
4 drive you two into work that morning?
5 　A. Correct.
6 　Q. You went down to the bottom of the hill, parked
7 your car, and he picked you up?
8 　A. Yes.
9 　Q. Okay. And then you traveled to Cross Lanes and
10 arrived in Cross Lanes at 7:00?
11 　A. Yes.
12 　Q. And then, once you got there, what do you
13 recall about what you did, why you were at Cross Lanes?
14 　A. We went up to the storage building and got the
15 trailer ready, put on the equipment that we needed,
16 hooked it up to the truck, and then we walked back down
17 to the bottom where the cars were parked. And I
18 remember we all stood there and talked for maybe ten
19 minutes, and then we got in a line and followed each
20 other out.
21 　Q. Okay. So when you would go, you went to the
22 storage building, and then you loaded the trailer. Did
23 you load the trailer before you hooked it to the truck?
24 　A. I'm not sure.

JAMES SKYLAR COOPER
September 16, 2020

22

1  Q. Okay. And I think you said that there was a
2  Zero Turn, a push mower and three weed eaters?
3  A. Yes. And there's also a tool box that's
4  attached to the trailer that has three leaf blowers and
5  like weed eater string in it.
6  Q. Do you load and unload the tool box with the
7  leaf blowers and weed eater string in it after each
8  shift, or does that just stay on?
9  A. That stays.
10 Q. That stays on the trailer?
11 A. Yes.
12 Q. It's locked, I'm assuming?
13 A. Yes.
14 Q. Okay. So aside from the Zero Turn, the push
15 mower and three weed eaters, do you recall loading
16 anything else on the trailer before you left that
17 morning?
18 A. No, I don't.
19 Q. Okay. Gas cans?
20 A. Gas cans, yeah.
21 Q. Okay. Are those also kept in the storage
22 building?
23 A. Yes, I believe so.
24 Q. All right. So you get there that morning, and

23

1  before you loaded the trailer and attached it to the
2  truck, do you remember doing anything else before that
3  when you got there?
4  A. No, I don't.
5  Q. Okay. Do you believe that loading the trailer
6  was the first thing you did that morning?
7  A. I mean, we could have maybe went inside the
8  office, but I'm not sure.
9  Q. Okay. And then I think you said that once you
10 had the trailer loaded and attached to the truck, you
11 went somewhere and talked for about ten minutes?
12 A. Yeah. Like at the entrance of the apartment
13 complex.
14 Q. This location, in Cross Lanes, is it in an
15 apartment complex?
16 A. Yes.
17 Q. And do you know why you waited around for ten
18 minutes before you left that morning?
19 A. I'm not sure, but I know the other two guys
20 were going to the place, too. I think maybe we was
21 waiting on them to get their truck ready, but I'm not a
22 hundred percent on why.
23 Q. And so when you say "the other truck," we're
24 talking about the 2018 Dodge Ram?

24

1  A. Yes.
2  Q. And you don't know the names of those two other
3  individuals?
4  A. No, I don't.
5  Q. Did they end up following you out to the site?
6  A. They actually led. It was them in front, then
7  Demetrius in the blue Chevy, and then me and Rick in his
8  vehicle.
9  Q. So you've got the two guys in front of the
10 Dodge Ram?
11 A. Yes.
12 Q. And then Demetrius Elder was behind them?
13 A. Yes.
14 Q. And then you all were directly behind
15 Demetrius?
16 A. Yes.
17 Q. Okay. Is the 2018 Dodge Ram a quad cab?
18 A. I believe so.
19    MR. DUFFIELD: I think you said 2018,
20 but...
21 BY MR. PERRY:
22 Q. Was it a '19? Do you think it was a 2019?
23 A. I think it might have been a '19, but I'm not a
24 hundred percent.

25

1     MR. DUFFIELD: That's what the dec page
2  shows. It's Dodge versus Chevy, but I think we've got
3  them straight.
4     MR. PERRY: Okay. Got you.
5  BY MR. PERRY:
6  Q. Before you left that morning, do you remember
7  doing anything else, other than loading the trailer and
8  attaching it to the truck and having that conversation,
9  at the entrance, for a few minutes while you waited for
10 the other guys to get ready to leave?
11 A. I don't remember anything else.
12 Q. Do you recall what time you would have left the
13 site in Cross Lanes?
14 A. I'm not a hundred percent sure, but I would say
15 maybe 7:20, 7:25-ish.
16 Q. And then Rick Huffman was driving the vehicle
17 that you were in?
18 A. Yes.
19 Q. You were in the front passenger seat?
20 A. Yes.
21 Q. Was there anything that you had in that car
22 that you loaded up that day in Cross Lanes?
23 A. I think Rick had his tools in the back seat,
24 actually.

**Page 26**

1  Q. And were these his personal tools, or were they
2  tools that Pison Management gave to him to use?
3  A. They would be his personal tools.
4  Q. As far as you know, then, no equipment, or
5  anything that was owned by Pison Management was being
6  transported in Mr. Huffman's vehicle?
7  A. Not that I recall, no.
8  Q. Okay. Once you left the Cross Lanes site, do
9  you remember making any stops before the accident?
10  A. No. I don't believe we made any stops.
11  Q. Do you remember how you traveled from Cross
12  Lanes to the location where the accident occurred?
13  A. Do you mean like which road?
14  Q. Yeah, which road.
15  A. I'm not too familiar with the area over there,
16  so not really, no.
17  Q. Did you get onto the interstate, at all?
18  A. I'm not real sure.
19  Q. Okay. When you went onto payroll, did you have
20  a time card that you kept?
21  A. No.
22  Q. Okay. Was there any way that you would log
23  your start times and end times, or did you just get paid
24  40 hours a week or worked a certain shift?

**Page 27**

1  A. Yeah. We was just paid 40 hours a week, but I
2  believe Demetrius would send all of the hours to John, I
3  think, and he would like let him know if somebody has
4  missed, or something.
5  Q. Okay. Was the 2019 Dodge Ram, was it pulling
6  anything?
7  A. No, it wasn't.
8  Q. Do you know what equipment they had on the
9  truck?
10  A. I'm not real sure. It would be whatever the
11  other two guys needed.
12  Q. Did you have any conversation about just riding
13  in the 2019 Dodge Ram since it was a quad cab and would
14  give you more room?
15  A. I think there might have been a conversation,
16  but I remember they had a lot of -- the back seat was,
17  pretty much, full of like tools and stuff they would
18  need.
19  Q. Okay. I'm assuming, but were there times that
20  you used your personal vehicle to travel to and from a
21  job site?
22  A. Yes.
23  Q. Did you get reimbursed for mileage?
24  A. No.

**Page 28**

1  Q. To your knowledge, did Mr. Huffman get
2  reimbursed for any mileage?
3  A. No, he didn't.
4  Q. After you loaded the trailer and attached that
5  to the truck the morning before you left, do you
6  remember going back to the truck, or doing anything
7  else, with respect to the truck, before you left?
8  A. I'm not real sure.
9  Q. Nothing that you can recall as you sit here?
10  A. No, I don't remember.
11  Q. Okay. So you're traveling on roads that you're
12  unfamiliar with. How far apart are the vehicles that
13  are traveling together?
14  A. I remember we was on a two-lane road. I think
15  this is where the accident occurred. I know we
16  was -- like the Dodge was in front, and then close
17  behind it was the blue Chevy, and then close behind it
18  was us.
19  Q. Okay. If you recall, about how many car
20  lengths were you traveling behind the Silverado?
21  A. I'm not real sure.
22  Q. Okay. In the event that you all got separated,
23  do you know whether or not Mr. Huffman knew where to go?
24  A. He did not.

**Page 29**

1  Q. Okay. What do you remember about the accident?
2  A. Not much, really. I remember coming to after
3  it happened, but like when it happened, I don't really
4  remember, like right at the moment.
5  Q. Okay. Can you go back and recall seeing the
6  vehicle that struck you? It was operated by Thelma
7  White, so I'll say the White vehicle, or Ms. White's
8  vehicle. Can you recall seeing Ms. White's vehicle, at
9  all, before the accident?
10  A. No.
11  Q. Do you remember anything about the impact, or
12  is your memory just really kind of coming to after the
13  accident?
14  A. I remember right before it. I remember hearing
15  Rick saying a four letter word like right before it
16  happened.
17  Q. Okay.
18  A. And then I guess it happened right after that,
19  and I came to while I was still in the car, afterwards.
20  Q. Okay. So the last thing you remember, before
21  the accident, is Rick saying a curse word, I'm assuming?
22  A. Yes.
23  Q. Okay. Do you recall if Ms. White's vehicle
24  struck the trailer attached to the Silverado?

JAMES SKYLAR COOPER
September 16, 2020

**Page 30**

1  A. I don't remember seeing it happen, but I
2  believe, now, what I know, that it did.
3  Q. Okay. Was this a day job, meaning, if you
4  know, that you were going to travel to the site and do
5  lawn work for the day and then come back to Cross Lanes
6  that evening?
7  A. Yes.
8  Q. And the intent would have been that you all
9  would have gone back to Cross Lanes and did your same
10 thing. You would have unloaded the trailer, put the
11 equipment back into the storage building and detached
12 the trailer from the truck and then drive home?
13 A. Yes.
14 Q. And I think you mentioned this, I can't
15 remember now if it was on the record, but since the
16 accident, you've not had any communications with anyone
17 at Pison Management?
18 A. No, I haven't.
19 Q. Have you talked to Demetrius Elder, at all?
20 A. No.
21 Q. Okay. As I understand your testimony, you
22 never had a conversation with anybody at Pison
23 Management about using your personal vehicle to travel
24 from job sites?

**Page 31**

1  A. I'm not real sure if we did, or not?
2  Q. You can't recall any conversations as you sit
3  here today?
4  A. Right.
5  Q. Do you recall any conversations about insurance
6  coverage for your vehicle if you drove it to and from a
7  job site?
8  A. Like if they had brought that to us?
9  Q. Yeah. If you would be insured under their
10 policies?
11 A. No. I don't think they ever mentioned it, no.
12 Q. Okay. I'm assuming I know the answer to this,
13 but I'm going to ask it: Do you recall having any
14 conversations with anybody at Pison Management about
15 insurance coverage, at all, as far as auto coverage?
16 A. I don't believe so, no.
17 Q. Okay. Was Mr. Huffman, to your knowledge,
18 experiencing any mechanical problems with his vehicle?
19 A. No.
20 Q. What was your typical job, or if you had one,
21 as far as the type of lawn care, did you use the Zero
22 Turn generally? Did you generally push mow? Did you
23 generally weed eat?
24 A. We would all kind of just switch off. Nobody

**Page 32**

1  really had an assigned job to do.
2  Q. Do you recall specifically what you loaded into
3  the truck that morning?
4  A. I'm not real sure exactly.
5  Q. Okay. As far as who the people were that
6  loaded the trailer that morning, was it you and Mr.
7  Huffman and Demetrius Elder?
8  A. Yes.
9  Q. Anybody else help you?
10 A. No.
11 Q. And I apologize, but I get blamed for this a
12 lot, but without being repetitive, and I'm not trying to
13 trip you up, but I just want to make sure the record is
14 clear: As I understand it, none of the equipment that
15 was loaded onto the trailer, or into the Silverado that
16 morning was equipment that you personally owned?
17 A. Right.
18    MR. PERRY: Okay. Skylar, I appreciate
19 your time. I don't have any other questions.
20    MR. DUFFIELD: Skylar, I just have a few
21 questions, and I apologize if some of these seem simple.
22 I think you've answered probably most of these, but just
23 to kind of clarify.
24

**Page 33**

1           EXAMINATION
2  BY MR. DUFFIELD:
3  Q. I know you told Mr. Perry that you couldn't say
4  how many car lengths the Dodge that you were riding in
5  was behind the Chevy truck and trailer at the time of
6  the crash?
7  A. Right.
8  Q. But in the seconds leading up to the crash, was
9  the Dodge you were traveling in immediately behind the
10 Chevy truck and trailer?
11 A. Yes.
12 Q. Okay. There was no vehicle in between?
13 A. No.
14 Q. You mentioned that you did not know the
15 location you were headed to. Do you know if Mr. Huffman
16 knew where he was headed to?
17 A. No, he did not.
18 Q. Was part of the reason you all were third in
19 line was because you were relying on Demetrius to show
20 you where to go?
21 A. Yes.
22 Q. Were you on the clock at the time of the
23 collision, meaning, were you getting paid for your time
24 as you were traveling to the job site?

**34**

1  A. Yes.
2  Q. Were you on your way to a job site at the time
3  of the collision?
4  A. Yes.
5  Q. Was it part of your job to travel to different
6  job sites for Pison Management?
7  A. Yes.
8  Q. What was the purpose of loading the equipment
9  on the trailer that morning?
10  A. So we could get it to the job site and use it
11  to cut the grass.
12  Q. At the time of collision, had you made it to
13  that job site yet?
14  A. No.
15  Q. I know you said you're not exactly sure what
16  you loaded on the trailer that morning. Are you certain
17  that you yourself loaded some of that equipment?
18  A. Yes.
19  Q. You're just not sure whether you loaded the
20  push mower versus the weed eater, or whatnot?
21  A. Right. Yes.
22  Q. And were you expected to use that equipment at
23  the job site you were traveling to?
24  A. Yes.

**35**

1  Q. And so once you got to the job site, if this
2  crash had never occurred, were you going to go and get
3  tools off of that trailer?
4  A. Yes.
5  Q. Once you were complete, in terms of your work
6  at that job site, did I understand you correctly to say
7  to Mr. Perry that the plan was to travel back to the
8  Cross Lanes location where the equipment was loaded onto
9  the trailer?
10  A. Yes.
11  Q. And was it part of your job to make sure that
12  that equipment made it back at the end of the day?
13  A. Yes.
14  Q. And so you would go back to the Cross Lanes
15  location and off load the equipment that you described
16  into that storage building?
17  A. Yes.
18  MR. DUFFIELD: That's all of the questions
19  I have. Do you have anything else?
20  MR. PERRY: I have nothing else.
21  MR. DUFFIELD: I guess we'll read.
22  (Witness excused)
23  (Whereupon, at 10:53 p.m., EDST the
24  foregoing deposition was concluded.)

**36**

1  STATE OF WEST VIRGINIA
2  STATE AT LARGE, to-wit:
3
4  I, ELIZABETH WILEY, a Stenotype Reporter and
5  Notary Public within and for the State of West Virginia
6  at Large, do hereby certify that: The foregoing witness
7  did appear before me at the time and place specified in
8  the caption hereof; after being by me first duly sworn,
9  the said witness' testimony was by me taken down by
10  Stenographic means and transcribed into the English
11  language as set forth herein, the same being a true and
12  correct transcript of the said testimony; That I am
13  neither Counsel for nor related to any of the parties
14  hereto and have no interest in the matter whatsoever;
15  that the attached transcript meets the requirements set
16  forth within article twenty-seven, chapter forty-seven
17  of the West Virginia Code.
18  Given under my hand this 21st day of September
19  2020.
20
21
22
23  _____
     Notary Public-State of         My Commission Expires
24  West Virginia at Large           August 11, 2025.

**37**

1  ERRATA SHEET
2  I, JAMES SKYLAR COOPER, do hereby certify that I
3  have read the foregoing transcript of my testimony given
4  at the time and place and for the purpose specified in
5  the caption hereof, and that it is true and correct to
6  the best of my knowledge and belief, except as to the
7  corrections I have suggested below:
8
9  _____       _____
    (Signature)                    (Date)
10
11       SUGGESTED CORRECTIONS
12  PAGE   LINE    AS TRANSCRIBED        SHOULD BE
    NO.    NO.
13
14
15
16
17
18
19
20
21
22
23
24

```
                                                    38
 1           ACKNOWLEDGEMENT
 2   STATE OF WEST VIRGINIA
 3   COUNTY OF KANAWHA, to-wit:
 4       I, the undersigned Notary Public within and for
 5   the County and State aforesaid, do hereby certify that
 6   JAMES SKYLAR PERRY, whose name is signed to the
 7   foregoing writing, bearing date the 16th day of
 8   September 2020, has this day personally acknowledged the
 9   same and has appeared before me in my said County and
10   State.
11       Give under my hand this        day of
12          , 2020.
13       My commission expires:
14
15
16
17
18   _____(Notary Public)
19
20
21
22
23
24
```

```
                                                    39
 1                  INDEX
 2
 3   WITNESS              BY MR.    BY MR.
                          PERRY     DUFFIELD
 4
     James Skylar Cooper    3         33
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21   Reporter's Certificate     Page 36
22   Witness Signature          Page 37
23   Acknowledgement            Page 38
24
```