## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
## AT CHARLESTON

**ERIE INSURANCE PROPERTY
& CASUALTY COMPANY,**

   **Plaintiff,**

**v.**           **CIVIL ACTION NO.: 2:20-cv-00321
HONORABLE IRENE C. BERGER**

**JAMES SKYLAR COOPER,**

   **Defendant and Counterclaimant.**

## MEMORANDUM OF LAW IN SUPPORT OF JAMES SKYLAR COOPER'S MOTION FOR SUMMARY JUDGMENT ON COUNTERCLAIM FOR DECLARATORY RELIEF

Now comes the Defendant and Counterclaimant, James Skylar Cooper, and in support of his previously filed *Motion for Summary Judgment on Counterclaim for Declaratory Relief* ("*Motion*"), provides the following memorandum of law. The issue currently before the Court is whether or not James Skylar Cooper ("Mr. Cooper") is entitled to underinsured motorist ("UIM") coverage through a commercial auto policy his employer, Pison Management, LLC "(Pison"), had with Erie Insurance Property & Casualty Company ("Erie"). *See Petition for Declaratory Judgment* ("*Petition*"), ECF 1, and *Respondent James Skylar Cooper's Answer to Petition for Declaratory Judgment and Counterclaims* ("*Counterclaim*"), ECF. 6. Based on the facts and law set forth below, Mr. Cooper requests that the Court grant his *Motion* and the declaratory relief requested in his *Counterclaim.*

## FACTUAL BACKGROUND

Mr. Cooper is a Pison employee whose primary job responsibility in August of 2019 was to mow the grass at Pison managed rental properties. *Cooper*, 6, Ex. 1. While

traveling to a job site on August 9, 2019, Mr. Cooper was involved in a head-on collision, which caused him to suffer serious injuries. *Counterclaim*, ECF. 6, *Cooper*, 34, Ex. 1, and *Crash Report*, Ex. 2.

On the morning of the collision (like most every other work day), Mr. Cooper arrived at Pison's Cross Lanes location where the grass cutting equipment was stored. *Cooper*, 8-9, 21-22, Ex. 1. Mr. Cooper and other workers proceeded to load the equipment (a zero turn mower, push mowers, trimmers, leaf blowers, and gas cans) onto a utility trailer for the purpose of transporting the equipment to the job site where the equipment would be used. *Cooper*, 21-22, 34, Ex. 1.[1] The utility trailer was towed by a 2004 Chevrolet Silverado truck that Pison owned and insured through Erie. *Cooper*, 15, Ex. 1. Grass cutting supervisor, Mr. Elder, typically drove the 2004 Chevrolet to and from job sites. *Cooper*, 9, 16, Ex. 1.

When the equipment was loaded, Mr. Cooper and another co-worker, Mr. Huffman, got into Mr. Huffman's personal vehicle to travel to the job site. *Cooper*, 24, Ex. 1.[2] As they had not previously been to this job site, Mr. Huffman and Mr. Cooper proceeded to follow directly behind the 2004 Chevrolet so that Mr. Elder could lead them to where they were going. *Cooper*, 10, 24, 28, 33, Ex. 1. Ahead of the 2004 Chevrolet was a 2019 Dodge Ram

---

[1]  While Mr. Cooper is not certain which of the equipment he loaded that morning, he is certain that he loaded some of the equipment that was on the trailer and was planning to use the equipment at the job site. *Cooper*, 32-34, Ex. 1.

[2]  Mr. Cooper described that the practice of taking multiple vehicles to the job site was mostly for comfort so that three men did not have to ride in the front of a single cab truck. *Cooper* 15-16, Ex. 1. While Mr. Huffman was not paid mileage, he and Mr. Cooper were paid for their time in traveling to and from each job site. *Cooper*, 33, Ex. 1. Pison did not have any policies or rules prohibiting workers from using their personal vehicles in such a manner. *Cooper*, 9, Ex. 1.

(also owned by Pison and insured by Erie), driven by another employee, who was headed to the same rental property to do other work. *Cooper*, 15, 23-24, 27, Ex. 1.

Once the crew got to the job site, the plan was to unload the equipment, mow the grass, do other maintenance work, and then return to the Cross Lanes location to offload and secure the equipment for the night. *Cooper*, 16-18, 30, Ex. 1. Mr. Cooper shared responsibility for making sure the equipment got to the work site and then back into Pison's storage building at the end of the workday. *Cooper*, 35, Ex. 1.

On August 9, 2019, the three vehicle caravan of Pison workers never made it to the job site. While headed north on Route 21, another vehicle that was headed south went left of center, struck the utility trailer being hauled by the 2004 Chevrolet, and then stuck Mr. Huffman's vehicle that was following close behind the trailer.[3] *Cooper,* 20, 28, 33, Ex. 1, *Crash Report*, Ex. 2. Mr. Cooper suffered serious injuries which required surgery, a prolonged stay in the hospital, and resulted in more than $300,000 in medical bills.[4] He is twenty-five years old and has not been able to return to work. *Cooper*, 6, Ex. 1.

The at-fault driver's liability insurance was insufficient to compensate Mr. Cooper for his harms and losses and Mr. Cooper sought UIM coverage through Erie.[5] The parties agree that the Erie commercial auto policy ("Policy") includes $1 million in UIM coverage.

---

[3] The lead vehicle, a 2019 Dodge, was not involved in the crash. *Crash Report*, Ex. 2.

[4] Mr. Cooper's injuries included a closed head injury, a comminuted right femur fracture, a right tibial plateau fracture, a left femoral head dislocation, a comminuted left acetabular fracture, a left wrist fracture, and a colon contusion.

[5] Mr. Huffman's vehicle was insured, but the policy did not provide UIM coverage. Mr. Cooper was able to qualify for UIM coverage through two of his own family member's insurance policies. However, the amount recovered from those two policies and the liability policy was still insufficient to cover Mr. Cooper's medical bills, let alone his total damages.

However, Erie denies that Mr. Cooper is entitled to UIM coverage under the Policy, which is what led to this action and the parties' opposing requests for declaratory relief.

*The Erie Insurance Policy*

The Policy provides certain insurance coverages for both "owned autos" and "non-owned autos." For UIM coverage, a premium was charged for both owned autos listed on the Amended Declarations page; the 2019 Dodge Ram that was leading the caravan and the 2004 Chevrolet Silverado that was hauling the grass cutting equipment and leading Mr. Cooper and Mr. Huffman to the job site. *See Policy,* p. 2 of 25, Ex. 3.[6] The $1 million in UIM coverage is provided through an "Uninsured/Underinsured Motorist Coverage Endorsement – West Virginia" ("Endorsement"), which defines an underinsured motor vehicle. *Policy*, pp.21-23, Ex. 3 (emphasis in original). Erie apparently concedes that the vehicle that went left of center and struck Mr. Huffman's vehicle qualifies as an "underinsured motor vehicle" under the Erie *UIM Endorsement*.

The insuring language from the *UIM Endorsement* provides:

> **OUR PROMISE**
> * * *
>
> If Underinsured Motorist Coverage is indicated on the **Declarations**, **we** will pay damages for bodily injury and property damage that **you** or **your** legal representative are legally entitled to recover from the owner of operator of an **underinsured motor vehicle**.
>
> Damages must result from a motor vehicle accident arising out of the ownership or use of the **uninsured motor vehicle** or **underinsured motor vehicle** as a motor vehicle and involve:

---

[6] The policy also defines owned autos to include a "non-owned trailer" while attached to an owned auto. *See Policy*, p. 8 of 35, Ex. 3.

4

1.     bodily injury to **you** or others **we** protect.   Bodily injury means physical harm, sickness, disease or resultant death to a person; or

\* . \* . \*

## OTHERS WE PROTECT

**We** also protect:

1.     any relative, if **you** are an individual;

2.     anyone else, while **occupying** any **owned auto we insure** other than an **owned auto we insure** being used without the permission of the owner.

3.     anyone else who is entitled to recover damages because of bodily injury to any person protected by this coverage.

4.     If **you** are an individual, anyone else while **occupying a non-own auto we insure** other than:

   a.     one **you** are using that is owned or lease by another person residing in **your** household.

   b.     one furnished or available for the regular use of **you** or anyone residing in **your** household.

   c.     one being operated by anyone other than **you** or a **relative.**

*Policy,* pp. 21-22, Ex. 3 (emphasis in original).[7] A Policy Change Endorsement for West Virginia altered the definition of **"Anyone we protect"** to include "[a]nyone else while using an **auto we insure** with **your** permission[.]" *Policy*, pp. 9, 24 of 35, Ex. 3 (emphasis in original).[8]

_____

   [7]The term "occupying" is defined in the policy to mean: "in or upon, getting into or out of, or getting off." *Policy*, p. 7 of 35, Ex. 3.

   [8] The Policy Change Endorsement adopted the definition of Persons We Protect that is found in the Liability Protection Section. *See Policy*, p. 24 of 35, Ex. 3 (emphasis in original).

5

There is no question that the 2004 Chevrolet qualifies as an "owned auto." However, Erie argues that Mr. Cooper was not "occupying" an owned auto, and therefore cannot qualify for coverage. Mr. Cooper argues that *West Virginia Code* §33-6-31(c) requires Erie to provide coverage for not just "occupying" a vehicle, but also for "using" a vehicle. *Answer to Counterlcaim*, p. 4 of 8, ¶25, ECF. 8. Mr. Cooper claims that he was using the 2004 Chevrolet to transport the tools he needed for the job and to navigate to an unfamiliar job site. *Cooper*, 33-34, Ex. 1, *Counterclaim*, p. 12 of 16,  ¶25, ECF. 6.

The Policy also provides certain coverage for "non-owned autos", for which the definition is:

> **Non-Owned Autos** (employer's Non-Ownership Liability).  These are **autos you** do not own, hire, rent or borrow that are used in **your** business, but only for coverages for which a premium charge is shown. This includes **autos** owned by **your** partners, employees or members of their households, but only while used in **your** business or personal affairs.

*Policy*, p. 8 of 25, Ex. 3.  Non-owned autos are listed on the declarations pages as Auto No 12. *See Amended Declarations*, p. 2 of 25, Ex. 4. The parties agree that Mr. Huffman's vehicle qualifies as an non-owned auto under the Erie Policy.[9] *Petition*, p. 4 of 8, ¶19, ECF. 1. However, Erie claims that it did not charge Pison for UIM coverage for non-owned vehicles and, thus, the policy provides no UIM coverage for non-owned vehicles. *Petition, p. 4 of 8, ¶22*, ECF. 1. *See also Policy*, p. 2 of 35, Ex. 3.[10]

---

[9] The declarations page lists non-owned vehicles as "Auto 12."  *See Amended Declarations*, Ex. 4.

[10] Erie admits that the policy would provide UIM coverage if the named insured was an individual. *See Petition*, ¶29, ECF. 1.

Mr. Cooper argues that irrespective of whether a premium was charged, Erie had a duty to offer Pison UIM coverage and that the UIM coverage offer had to be a commercially reasonable offer, followed by a knowing and intelligent rejection of UIM coverage. *Counterlcaim*, pp. 13, 14 of 16, ECF. 6. Mr. Cooper argues that Erie failed to make a commercially reasonable offer of UIM coverage and failed to obtain a knowing and intelligent rejection of UIM coverage and, therefore, UIM coverage should be afforded by operation of law. *See Counterlcaim*, pp. 13, 14 of 16, ECF. 6.

With regard to Erie's offer of UIM coverage, Erie provided Pison with a form that did not include **any** premium information for the coverages that Erie attempted to offer.[11] *See UIM Selection Form*, Ex. 5 (emphasis added). Despite this fact, Pison selected the maximum coverage listed on the form.[12] *See Id. UIM Selection Form*, Ex. 5. No separate form listing the premiums or indicating that Pison rejected UIM coverage was ever obtained.

## APPLICABLE LAW

The West Virginia legislature has demonstrated a clear intent to afford coverage to anyone "**using**" a vehicle as a means of giving greater protection to those who are involved in automobile accidents and the statute should be liberally construed to effect coverage. *See* Syl. Pt. 3, *Burr v. Nationwide Mut. Ins. Co.*, 178 W.Va. 398, 359 S.E.2d 626 (W.Va., 1987) (emphasis added). Any exclusionary language is to be strictly construed against the

---

[11] The form does indicate that two vehicles are subject to the premiums, but does not identify which two and does not list the premiums. *See UIM Selection Form*, Ex. 5

[12] While the form indicates that $500,000 in underinsured motorist coverage was offered and selected, Erie has agreed that the coverage was later, but prior to the collision at issue, rolled up to $1 million due to a change in the liability limits. Apparently a new form was not completed at that time.

7

insurer so that the purpose of providing indemnity is not defeated. Syl. Pt. 5, *National Mut. Ins. Co. v. McMahon & Sons, Inc.*, 177 W.Va. 734, 356 S.E.2d 488, (W.Va., 1987), *overruled on other grounds by Potesta v. U.S. Fid. & Guar. Co.*, 202 W.Va. 308, 504 S.E.2d 135 (W.Va., 1998) and *Parsons v. Halliburton Energy Services, Inc.*, 237 W.Va. 138, 785 S.E.2d 844 (W.Va., 2016).

*West Virginia Code,* 33–6–31(c) requires insurance companies to make underinsured motorist coverage available to insureds "for any person, except a bailee for hire, who **uses** the insured vehicle with the express or implied consent of the named insured. *See W.Va. Code* 33-6-31(c) (emphasis added). Insurance companies cannot limit coverage to those who are only "**occupying**" a vehicle, but the policy must also provide coverage to those who are "using" a vehicle. *See* Syl. pts. 3 and 5, *Adkins v. Meador*, 201 W.Va. 148, 494 S.E.2d. 915 (W.Va., 1997) (the term "use" in *W.Va. Code,* 33–6–31(c) is less restrictive than the term "occupy" and "use" implies employing the vehicle for some purpose or object, but depends upon the factual context of each case) (emphasis added).

In situations where the individual is separated from the vehicle at the time of an incident, the Supreme Court of Appeals of West Virginia has further instructed courts to determine use by evaluating whether or not there is a causal connection between the motor vehicle and the injury. Syl. pt. 2, *Cleaver v. Big Arm Bar & Grill, Inc.*, 202 W.Va. 122, 127, 502 S.E.2d 438, 443 (W.Va.,1998). In making that determination, the court may consider, but is not limited by, the following "*Cleaver*" factors:

> a)    whether the individual was in reasonably close proximity to the insured vehicle at the time of the accident;
>
> b)    whether the individual was vehicle oriented as opposed to highway or sidewalk oriented;

8

    c)    whether the individual had relinquished control of the vehicle; and

    d)    whether the individual was engaged in a transaction reasonably related to the use of the vehicle at the time of the accident.

*Cleaver*, 202 W.Va. 122, 127, 502 S.E.2d 438, 443. The four factors are instructive guides and no one factor carries more weight than the others. *Id*.

### UIM Coverage Offers / Rejections

"Where an offer of optional coverage is required by statute, the insurer has the burden of proving that an effective offer was made, and that any rejection of said offer by the insured was knowing and informed." *Bias v. Nationwide,* 179 W. Va. 125, 365 S.E.2d 789 (W.Va., 1987). For an offer to be deemed commercially reasonable, "an offer must state the nature of the coverage offered, the coverage limits, and the costs involved." *Thomas v. McDermitt*, 232 W. Va. 159, 164, 751 S.E.2d 264 (W.Va., 2013) (*citing Bias*, 179 W.Va. at 127, 365 S.E.2d at 791). "Failure to provide an insured with adequate information to make an intelligent decision renders a selection/rejection form defective." *Westfield Ins. Co. v. Bell*, 203 W. Va. 305, 507 S.E.2d 406 (W.Va.,1998). When an insurer is required by statute to offer optional coverage, it is included in the policy by operation of law when the insurer fails to prove an effective offer and a knowing and intelligent rejections by the insurer. *Riffle v. State Farm Mut. Auto. Ins. Co.*, 186 W.Va. 54, 55, 410 S.E.2d 413, 414 (W.Va.,1991) (citing Sly pt. 2, *Bias*, 179 W.Va. 125, 365 S.E.2d 789). In these circumstances, the coverage owed is the amount that the insurer was required to offer under the statute, which is an amount not less than the liability limits. *See Riffle*, 179 W.Va. at 55-56, 410 S.E.2d at 414-415.

9

## LEGAL ARGUMENT

I. **THE ERIE POLICY PROVIDES UIM COVERAGE TO MR. COOPER AS HE WAS USING AN OWNED AUTO AT THE TIME OF THE COLLISION.**

### A. Erie must provide coverage for "use" and not just "occupancy."

Erie cannot limit UIM coverage to those who are occupying an insured vehicle. The UIM Endorsement states that it will pay damages for bodily injury to "you and others we protect" and others we protect is defined to include not only the named insured, but also "anyone else, while **occupying** any **owned auto we insure**[.]" *See Policy,* pp. 21-22 of 35, Ex. 3.[13] Limiting UIM coverage to occupancy is contrary to *West Virginia Code* §33-6-31(c), which requires UIM coverage be provided to anyone who "uses" the motor vehicle. In fact, West Virginia law has long held that restricting coverage to occupancy is too limited and that policies must be interpreted as providing coverage for "use" and not just occupancy. *See* Syl. pt. 2, *Universal Underwriters Ins. Co. v. Taylor*, 185 W.Va. 606, 408 S.E.2d 358 (W.Va., 1991) (provisions in an insurance policy that are more restrictive than statutory requirements are void and ineffective as against public policy) and *Adkins*, 201 W.Va. 148, 494 S.E.2d. 915 (finding that similar policy language limiting coverage to occupancy was void). Moreover, *West Virginia Code* §33-6-17 mandates that the Erie UIM Endorsement shall be construed to contain the statutorily required coverage.

In the *Adkins* decision, the Supreme Court of Appeals of West Virginia held that "use" "implies employing the vehicle for some purpose or object of the user" and whether or not an injury arose from the "use" depends on the factual context of each case. Syl. pts.

---

[13] As noted above, the term "anyone we protect" is defined more broadly in the policy and includes anyone "using" any auto insured by the policy. *See Policy,* pp. 9, 24 of 35, Ex. 3. The Erie policy insures non-owned vehicles. Thus, as Mr. Cooper was occupying a non-owned vehicle, he qualifies for UIM coverage under the "anyone we protect" definition.

3 and 5, in part, *Adkins*, 201 W.Va. 148, 494 S.E.2d 915. Thus, the issue here is whether

Mr. Cooper was using the 2004 Chevrolet, not whether he was occupying it.[14]

**B.      Mr. Cooper was using the vehicle even through he was not operating it and was separated from it.**

The fact that Mr. Cooper was not riding in, operating, or controlling the 2004

Chevrolet is not determinative of whether he was using it. "The term 'use' is widely

recognized to mean more than driving, or being driven in, a motor vehicle." *Adkins*, 201

W.Va. at 153, 494 S.E.2d at 920. As noted by the Supreme Court of Appeals in *Adkins:*

> police cruisers not only transport police officers, but they are used for
> protection, communication, traffic control, or as a mobile office; **fire
> trucks not only transport firemen, they carry equipment to put
> out fires; ambulances not only haul paramedics, but carry
> patients and the equipment used to save their lives;** garbage
> trucks not only transport sanitation workers, but they are used by the
> workers to collect, haul and dump garbage; tractor-trailers not only
> haul their drivers, but are used to deliver goods; and school buses
> carry young children to and from school in addition to carrying the
> county employees that drive the buses.

*Adkins*, 201 W.Va. at 154-155,  494 S.E.2d at 921-922. (footnotes removed, emphasis

added).[15] As recognized by the Supreme Court of Appeals, a vehicle can be used to

---

[14] Arguably, Mr. Cooper was also "occupying" the 2004 Chevrolet under the Supreme Court of Appeals interpretation in *Keefer. Keefer v. Ferrell.* 221 W.Va. 348, 655 S.E.2d 94 (W.Va., 2007)(per curium). In that case, although Mr. Keefer had not made it to the trailer to load the tractor, the Court found he was "getting on" the trailer and, therefore, occupying the insured vehicle. *Keefer*, 221 W.Va. 348, 354, 655 S.E.2d 94, 100. Using this interpretation, Mr. Cooper was arguably in the process of "getting into" the trailer being hauled by the 2004 Chevrolet as he was preparing to retrieve his equipment once he got to the job site, just like Mr. Keefer was planning to load the tractor once he got to the trailer.

[15] The Court in *Adkins* cited to an Iowa case in which the Supreme Court found that an employee was using a work vehicle, even though he may have been twenty feet away, noting that the truck was the employees "toolbox on wheels".  *See Adkins*, 201 W.Va. at 156, 494 S.E.2d at 923 *citing United Stated Fidelity & Guaranty Co.*, 562 N.W.2d 627 (Iowa, 1997).

transport tools and equipment, as Mr. Cooper was using the 2004 Chevrolet at the time of the collision.

A year after the *Adkins* decision, the Supreme Court of Appeals further emphasized that a person can be using a vehicle, even when the person is separated from the vehicle at the time of the accident. *See* Syl. Pt. 2, in part, *Cleaver*, 202 W.Va. 122, 502 S.E.2d 438. For situations where the person is separated from the vehicle, the Supreme Court instructs courts to consider the "*Cleaver* factors[16] as instructive guides in determining whether there is a causal connection between the insured vehicle and the injury. *Id.* As noted above, no one factor carries more weight than the others. *Id.* at 202 W.Va. at 443, 202 W.Va. at 127.

Not only can an injured party be using a vehicle when separated from it, the fact that another person is actually driving or in control of the insured vehicle is also not determinative of whether another person is using the vehicle. In 2007, the Supreme Court of Appeals decided the *Keefer* case. In that case, Mr. Keefer was operating a farm tractor on a public roadway when he was struck from behind. *Keefer*, 221 W.Va. at 351, 655 S.E.2d at 97. Mr. Keefer was on his way to a private driveway where he was planning to load the tractor onto a trailer being towed by a truck (the insured vehicle) which was parked and under the control of another person. *Id.*, 221 W.Va. at 354, 655 S.E.2d at 100. At the time of the collision, the tractor had not reached the truck and trailer but was twenty-five to thirty feet away. *Id.* Under these circumstances, the Court found:

---

[16] The Court recognized that the four factors are based on the criteria used by a Court of Appeals in Washington, as announced in *Rau v. Liberty Mutual Insurance Co.*, 21 Wash. App. 326, 585 P.2d 157 (Wash. App., 1978).

(1)     the tractor was in reasonably close proximity to the truck;

(2)     the tractor was orientated toward the truck at the time;

(3)     the relinquishment of control factor was not applicable as the intended use of the truck to haul the tractor did not require him to operate the truck; and

(4)     Mr. Keefer was engaged in a transaction reasonably related to the use of the vehicle.

*Id.* 221 W.Va. at 355-356, 655 S.E.2d at 101-102.

Based on Supreme Court of Appeals of West Virginia precedent, the fact that Mr. Cooper was in a vehicle immediately behind the insured vehicle and not operating or in control of the 2004 Chevrolet is not determinative of use. The ultimate determination of whether or not Mr. Cooper was using the 2004 Chevrolet depends on the *Cleaver* factors, which, as demonstrated below, all support a finding of use.

### C.     The *Cleaver* factors demonstrate that Mr. Cooper was using the 2004 Chevrolet and is entitled to UIM Coverage under the Erie Policy.

#### i.     Proximity

At the time of the collision, Mr. Cooper was following "close" behind the 2004 Chevrolet and trailer. *Cooper*, p. 28, Ex. 1. There were no vehicles in between the two vehicles.[17] *Id.,* Ex. 1. Given that the Supreme Court of Appeals of West Virginia and other courts have considered twenty-five to thirty feet "reasonably close," it is clear that the proximity factor favors a finding that Mr. Cooper was using the 2004 Chevrolet as he was obviously within a similar distance, following closely behind the vehicle. *See Cooper*, 28, Ex. 1; *See also Keefer*, 221 W.Va. at 355, 655 S.E.2d at 101; *Great American Ins. Co. v.*

---

[17]   The fact that both the trailer that was attached to the 2004 Chevrolet and the vehicle Mr. Cooper was riding in were both involved in the collision also demonstrates how closely the vehicles were at the time of the collision.

*Cassell*, 239 Va. 421, 389 S.E.2d 476 (Va., 1990) (finding use where injured person was twenty to twenty-five feet away from insured vehicle); *Simpson v. United States Fidelity & Guar. Co.*, 562 N.W.2d 627, 631 (Iowa, 1997) (twenty feet was close proximity); *Oberkramer v. Reliance Ins. Co.*, 650 S.W.2d 300, 301 (Mo. App. E.D.,1983) (finding use when injured person was between 25 and 50 feet away from the vehicle); *Hartford Acc. Indem. Co. v. Booker*, 140 Ga.App. 3, 4, 7, 230 S.E.2d 70, 71, 73 (Ga. App., 1976) (injured party was thirty feet away from the insured vehicle).

### ii.  Orientation

Mr. Cooper was sitting the front seat, facing forward, in a vehicle that was immediately behind the 2004 Chevrolet. *Cooper*, 25, 28, Ex. 1. He was vehicle oriented. He was not moving away from the vehicle, as was the individual in *Cleaver*. *See Cleaver*, 202 W.Va. at 126, 502 S.E.2d. at 442. He was facing and traveling toward the insured vehicle, like the tractor operator in *Keefer*. See *Keefer*, 221 W.Va. at 356, 655 S.E.2d at 102 Thus, just like the Court found in *Keefer*, the orientation factor favors a finding of use in this case.[18]

### iii.  Control

The Supreme Court of Appeals of West Virginia has held that the control factor is irrelevant in cases where the intended use of the vehicle does not actually require operation or control of the vehicle. *See Keefer*, 221 W.Va. at 355–56, 655 S.E.2d at

---

[18] It should be noted that while the orientation criteria was adopted from *Rau*, an appeals Court in Washington State, the Supreme Court of Washington, en banc, later abandoned this factor holding:
"[a] narrow focus on the injured person's physical orientation toward or away from the insured vehicle is contrary to the broad commonsense assessment of the reasonable expectations of the insured that the causal connection, geographic proximity, and essential transaction factors are designed to foster. Consequently we find it appropriate to abandon the vehicle oriented factor entirely." *See Butzberger v. Foster*, 89 P.3d 689, 696, 151 Wash.2d 396, 408 (Wash.,2004).

101–102. In *Keefer*, the Court found that the tractor operator's use of the truck and trailer onto which he intended to load the tractor did not require him to operate the truck or trailer, or exert control over it:

> Under the facts of this case, the inquiry as to "whether the individual had relinquished control of the vehicle" is not applicable because Mr. Keefer was not in control of the truck and the intended use of the truck to haul the tractor did not require him to operate the truck during the loading process.

*Id.* Just like in *Keefer*, Mr. Cooper's intended use of the insured vehicle (to transport tools and to lead him to the job site) did not require him to operate the truck. Just as this factor was found irrelevant in *Keefer*, so too is it irrelevant in this case. *Id.*

Even if the Court were to consider the control factor, it still favors a finding of use. Control extends beyond the point of physical contact and "particularly when it is still be utilized." *Cleaver*, 202 W.Va. at 127, 502 S.E.2d at 443 citing with approval to *Bernard v. Nationwide Mut. Fire Ins. Co.*, 206 Ga.App. 519, 426 S.E.2d 29 (Ga. App., 1992). Mr. Cooper's use (transportation of equipment and navigation to a job site) was ongoing at the time of the collision. He had not relinquished control insofar as it related to his specific use of the vehicle. Mr. Cooper's use never required operation and his use had not ceased at the time of the crash.

The Supreme Court in *Cleaver* found it important, in terms of use, that the young man who was struck and killed while crossing the road had already fulfilled the purpose for which he was utilizing the car when he parked and exited. *Cleaver*, 202 W.Va. at 126,502 S.E.2d at 442 (finding that he had relinquished control under those circumstances). Unlike the young man in *Cleaver*, the young man in this case, Mr. Cooper, had not yet fulfilled his purpose of using the 2004 Chevrolet – his use of the vehicle was ongoing.

15

Further, the degree of control Mr. Cooper was exerting was even greater than the tractor operator in *Keefer*. Whereas Mr. Keefer's use of the trailer had not even begun when the incident occurred, Mr. Cooper was actively in the process of using the 2004 Chevrolet to transport tools and lead him to a job site. *See Keefer*, 221 W.Va. at 355–56, 655 S.E.2d at 101–102. Thus, if this factor is considered, it favors a finding of use. Mr. Cooper had not relinquished control of the vehicle for the purposes for which he was using it at the time of the collision.

### iv.   Engaged in a transaction reasonably related to use

The final factor is aimed at ensuring that there is a causal relationship between a person's use of a vehicle and his or her injury. As recognized by the Supreme Court of Washington:

> [i]t would defy common sense for an insured vehicle's UIM coverage to extend to an injury wholly unrelated to the use of the vehicle. Nonetheless the requisite causal relation or connection does not require the use of the insured vehicle be a proximate cause of the injury.

*Butzberger*, 89 P.3d at 694, 151 Wash.2d at 404. Because of this, the Supreme Court of Appeals of West Virginia only requires the injured party "to demonstrate that the injury originated in, grew out of, or flowed from the use of the vehicle." *Adkins*, 201 W.Va. at 156, 494 S.E.2d at 923 citing with approval *McMichael v. Aetna Ins. Co.*, 878 P.2d 61 (Colo. Ct. App., 1994) aff'd 906 P.2d 92 (Colo., 1995).

At the time of the collision, Mr. Cooper was actively engaged in transactions directly related to his use of the 2004 Chevrolet. The vehicle was being used to transport equipment and lead employees to a job site. That is exactly what Mr. Cooper was using the vehicle for at the time of the collision. Thus, his injuries "originated in, grew out of, and

flowed from" his use. *Id.* Just as the Court in *Keefer* found that the tractor operator, (who had not even made it to the truck and trailer) was engaged in use "causally connected to the use of the" truck, so too was Mr. Cooper, who was already engaged in his use of the 2004 Chevrolet. *Keefer*, 221 W.Va. at 356, 655 S.E.2d at 102. Moreover, just as the Court in *Keefer* found that it was foreseeable that injuries may occur during the loading process (even though Mr. Keefer had not made it close enough to load at the time) so too was it foreseeable that a work truck used to transport equipment and navigate workers to job sites on the public roads would become involved in a collision and injure employees. *Id.*

**D.    The Court must construe the UIM statute liberally in order to provide for the preeminent public policy that UIM motorists are fully compensated.**

The UIM statute is remedial and should be liberally construed. *Perkins v. Doe*,177 W.Va. 84, 85,  350 S.E.2d 711, 712 (W.Va.,1986). Further, "the preeminent public policy of this state in uninsured and underinsured motorist cases is that the injured person be fully compensated for his or her damages not compensated by a negligent tortfeasor, up to the limits of the uninsured or underinsured motorist coverage." *State Auto. Mut. Ins. Co. v. Youler*, 183 W.Va. 556, 564, 396 S.E.2d 737, 745 (W.Va.,1990). Therefore, public policy dictates that the language in the Erie Policy be liberally construed and that Mr. Cooper be compensated up to the limits of the UIM coverage where he was using a insured vehicle.

Mr. Cooper need not satisfy all four of the *Cleaver* factors, but the fact that he does clearly indicates that he was using an insured vehicle at the time of the collision. The Erie policy provides $1 million in UIM coverage for "anyone else, while [using] any owned auto", Mr. Cooper is entitled to UIM coverage has he was using an owned auto. His Motion should be granted and the Court should declare that Mr. Cooper is entitled to UIM coverage under the Erie policy.

## II.    ERIE MUST PROVIDE UIM COVERAGE FOR NON-OWNED VEHICLES DUE TO IT'S FAILURE TO MAKE A COMMERCIALLY REASONABLE OFFER.

The Erie Policy specifically identifies non-owned vehicles as covered autos on its declarations page. *See Amended Declarations*, Ex. 4 (non-owned autos listed as Auto 12). For non-owned autos, the Erie Policy provides $1 million in liability coverage. *Id. West Virginia Code* §33-6-31(b) requires that every liability insurance policy issued in West Virginia must provide an option for the insured to purchase underinsured motorist coverage up to an amount not less than the bodily injury liability limits. Thus, when Erie agreed to provide liability insurance for Pison's non-owned autos, Erie was required to make a commercially reasonable offer of UIM coverage to Pison for the non-owned autos, like the vehicle Mr. Cooper was occupying.[19] *See Martin v. State Farm Mut. Auto. Ins. Co.*, 809 F. Supp.2d 496 (S.D. W.Va., 2011) (to fulfill its obligations under *West Virginia Code* §33-6-31(b) an insurer must make an effective offer of the optional UIM coverage.)

A commercially reasonable offer is one that provides the insured with "adequate information to make an intelligent decision. The offer must state, in definite, intelligible, and specific terms, the nature of the coverage offered, the coverage limits, and the costs involved." *Martin*, 809 F. Supp.2d 496 (*citing Bias*, 179 W.Va. at 127, 365 S.E.2d at 791). In any litigation challenging an insurance company's offer, "the insurer has the burden of proving that an effective offer [of optional coverage] was made, and that any rejection of said offer by the insured was knowing and informed[.]" *Bias*, at Syl. pt. 1.

One way that an insurer can demonstrate a commercially reasonable offer is through the use of the West Virginia Insurance Commissioner's prescribed form. *See West*

---

[19]  Mr. Cooper was most certainly "occupying" Mr. Huffman's vehicle, a non-owned vehicle under the policy, as he was "in" that vehicle. See *Policy*, p. 7 of 35, Ex. 3.

*Virginia Insurance Commissioner's Informational Letter No. 121* (July 2000), Ex. 6. The Informational Letter, like *West Virginia Code*, §33-6-31(b), requires the insurer to provide the insured with the premium, or rate calculation for the optional coverage.

In this case, the form that Erie used to offer UIM coverage failed to provide Pison with **any** premium information. *See UIM Selection Form*, Ex. 5. In fact, for each level of coverage listed on the UIM Coverage Offer form, Erie failed to list any premium and, in stead, typed "Not Applicable" under the premium column. *Id.* Therefore, Erie failed to provide a commercially reasonable offer of UIM coverage, whether it was for owned or non-owned autos.[20]

West Virginia law provides that when an "insurer fails to prove an effective offer and knowing waiver of statutorily required coverage by the insured, the insurer must provide the minimum coverage required to be offered by statute." Syl. Pt. 2, in part, *Riffle*, 186 W. Va. 54, 410 S.E.2d 413. "The statute requires the insurer to offer underinsured motorist coverage 'up to an amount not less than the limits of the bodily injury liability insurance and property damage insurance.'" Id. at 55, 414 *citing Bias*, 179 W. Va. 125, 365 S.E.2d 789. Therefore, because Erie failed to make a commercially reasonable offer and obtain a knowing and intelligent rejection of UIM coverage, Erie is required to provide $1 million in

---

[20] Despite not being provided any premium information, Pison selected the highest coverage available, which certainly indicates a desire for UIM coverage. *See UIM Selection Form*, Ex. 5. As Erie has not presented any other evidence of a commercially reasonable offer, Erie cannot meet its burden of proving that an effective offer was made, and that any rejection of such an offer was made. If it were, it certainly was not a knowing and intelligent waiver as Pison was never informed of the premiums for the coverage.

UIM coverage for those autos to which it agreed to provide liability coverage. This includes both the owned autos, but also the non-owned autos listed on the declarations page.[21]

WHEREFORE, for the reasons set forth above, James Skylar Cooper requests that the Court grant his Motion and declare that he is entitled to the UIM coverage provided by the Erie policy both for his use of an owned auto and for his occupancy and use of a non-owned auto.

**JAMES SKYLAR COOPER,**

**Defendant and Counterclaimant,**

**By Counsel:**

/ss/ R. Chad Duffield
ROBERT A. CAMPBELL (W. Va. State Bar No. 6052)
R. CHAD DUFFIELD (W. Va. State Bar No. 9583)
JENNIFER D. ROUSH (W.Va. State Bar No. 11165)
FARMER CLINE & CAMPBELL, PLLC
746 Myrtle Road (25314)
Post Office Box 3842
Charleston, WV  25338
(304) 346-5990

---

[21] Erie cannot circumvent the requirement that it make a commercially reasonable offer of UIM coverage by including, after inception of the policy, language that UIM coverage is only provided if a premium is listed on the declarations page. Because Erie agreed to provide liability coverage for non-owned autos, it was required to make a commercially reasonable offer of UIM coverage and failed to do so.

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON**

**ERIE INSURANCE PROPERTY
& CASUALTY COMPANY,**

     **Petitioner,**

**v.**                       **CIVIL ACTION NO.: 2:20-cv-00321**

**JAMES SKYLAR COOPER,**

     **Respondent.**

## **CERTIFICATE OF SERVICE**

I hereby certify that on November 2, 2020, I presented the foregoing "James Skylar Cooper's Motion for Summary Judgment" to the Clerk of Court for filing and uploading to the CM/ECF system and I hereby certify that I have served the following CM/ECF participants:

> Matthew J. Perry, Esq.
> James D. Lamp, Esq.
> Lamp Bartram Levy Trautwein & Perry, PLLC
> 720 Fourth Avenue
> Post Office Box 2488
> Huntington, WV 25725-2488
>
> *Counsel for Petitioner*

> /ss/ *R. Chad Duffield*
> R. CHAD DUFFIELD
> (W.Va. State Bar No. 9583)